Kevin Lee Brittain
TDCJ #1915233, Gist Unit
3295 FM 3514
Beaumont, TX 77705-7655

30 March, 2015

83,002-01

Honorable Abel Acosta, Clerk
Court of Criminal Appeals
P.O. Box 12308
Austin, TX 78711-2308

RECEIVED IN
COURT OF CRIMINAL APPEALS
APR 14 2015
Abel Acosta, Clerk

RE: Cause No. F1219562-A

Dear Mr. Acosta,

Please find enclosed the following:

1) Memorandum of "Legal Citations and Arguments" as provided
for in CCA instruction #7 for Application for a Writ of Habeas
Corpus; and,

2) Applicant's Response to 145th District Judge's "Order Denying
Application for Writ of Habeas Corpus," with supporting documentation.

All materials are in reference to the above numbered and
styled cause.

Sincerely ~ [signature]

KEVIN BRITTAIN, APPLICANT
EX PARTE

CC: Nacogdoches County District Clerk Loretta Cammack.

CAUSE NO: F12-19562-A

EX PARTE:                    §        IN THE DISTRICT COURT
                             §        145th JUDICIAL DISTRICT
KEVIN LEE BRITTAIN           §        NACOGDOCHES COUNTY, TEXAS
                             §

APPLICANT'S RESPONSE TO ORDER DENYING
WRIT OF HABEAS CORPUS WITH
"FINDINGS OF FACT"

On this the 30th day of March, 2015; I, KEVIN LEE BRITTAIN, TDCJ#01915233, EX PARTE, file this RESPONSE to the above numbered and styled Judge's Order and Finding of Fact. I, hereinafter referred to as Applicant, will address and refute, with referenced supporting and documented evidence, each enumerated "Finding of Fact" and subsequent "Conclusions of Law" as set forth personally by the hand of the Honorable Judge ~~Campbell~~ Cox.

I will follow the same chronological format as the Order filed by the Judge, and again, will provide documented evidence provided by the Judge himself, as well as reports and sworn statements from the case file itself, in addressing the numerous inconsistencies and fabrications in this Cause and Order.

Pg. 1 of 13

TO WIT:

1. Beginning with FINDINGS OF FACT (1.) in Judge's Order Denying Application of Writ of Habeas Corpus, (hereinafter referred to as Judge's Order, see Exhibit "E" PP 1-3), Judge Cox claims he never recused or removed himself from Applicants' proceedings in 2000. It is an established fact that Applicants' father was previously a Master Police Officer with the Nacodoches Police Department, and since that time, has long since been an Investigator with the Nacodoches County Attorney's Office; and, by Judge Cox's own words on page 2 of Judges Order (3.), has had a very long and personal relationship with Judge Cox, including being "... the only person to arrest this District Judge." Based on that relationship, Applicant and his father discussed numerous absences from the Bench in 2000 proceedings by Judge Cox as being attributed to an ethical response

to a Judicial conflict of interest. Judge Cox claims this never occurred, but provides no documentation in support of that claim.

2. In FINDINGS OF FACT (2.) of Judge's Order, Judge Cox denies the employment of Tim James as Applicants' attorney was ineffective based entirely on an affidavit filed by Attorney James as the sole source of fact. Defense attorney Tim James filed this affidavit, in support of the State's position, only after Judge Cox disclosed to him that an 11.07 Writ had been filed and an Ineffective Assistance of Counsel claim had been lodged against him in said Writ. A casual observer might logically conclude that an attorney, armed with such knowledge, would file an affidavit so constructed as to illustrate nothing but a stellar and ethical representation of his client. Nonetheless, Applicant will illustrate ~~demonstrate~~ the inconsistencies of Attorney James' affidavit and its clearly biased slant in ~~illustrating with~~ Supporting Judge Cox, with whom

Pg. 3 of 13

he has enjoyed a professional working relationship for decades.

In Attorney James' Affidavit (see Exhibit "F", pp. 1-3), Point 1.), he ~~makes it~~ states that (he) "... took this case pro bono out of respect for Kevin Brittain's family." This establishes two facts: first, that Tim James is a friend ~~and colleague~~ of the Brittain family, and second, that Tim James has enjoyed a professional relationship in what is an appreciably small legal community, for many, many years, ~~He goes on to state~~ with Officer/Investigator Brittain. He goes on to state that he "... interviewed all witnesses and the arresting officers ...", and that "... witnesses did not see the actual confrontation with the knife..." And he further stated that "One witness (emphasis added) even stated that Mr. Brittain pulled the knife out and lunged at the Deputy." (See Exhibit "C", pg. 1) Exhibit "C" is an Investigation Report prepared by Investigator Gary Partin, hired by this same Attorney James, which states in part,

Pg. 4/8 13

that, "After reviewing all original statements, viewing the video and interviewing persons with first hand ~~knowledge of the brief time period of the alleged assault~~ of a Peace Officer, Parten can only find ONE MENTION (emphasis added) of a lunge or any motion towards Deputy Molanders in all the information gathered. This was two sentences in the Probable Cause Affidavit prepared by Deputy McDonald, who was NOT present in the time period the act is alleged." (See Exhibit "D", Pg. 1). In Exhibit "D", note the time stamp in the Warrantless Affidavit ~~this~~ prepared by Deputy McDonald. He could not have been a witness, the "One witness" stated by Attorney James in the affidavit. Furthermore, in the Voluntary Statement (Exhibit "A", pp 1-2) given by Bryan Loudenslager, who not only witnessed but physically participated in this ~~entire~~ entire allegation,

Pg. 5 of 13

there is NO MENTION made of any lunge or move toward Deputy Molanders made with the knife. And, according to Judge Cox's ~~Conclusions of Law~~ FINDINGS OF FACT, (Exhibit "E", Pg. 3), this One witness, who ~~did~~ Could not have witnessed the alleged assault / lunge with the knife, "... is the crux of the indictment." (Emphasis added.)

Next, in affidavit point (2.), Attorney James claims that he "negotiated the State's offer from 15 down to 5 years." This is simply untrue. Attorney James maintained throughout his representation, up until two weeks before the trial date, that the case was "bogus and fabricated," rife with inconsistencies and shoddy police work. (All of which was investigated and reported to him by a reputable and established Investigator, Gary Paxton, whose findings of fact he completely ignored in his representation of Applicant.) Additionally, as part of a growing list of unutilized facts and witnesses, (in Exhibit "B", pp. 1-3), you will find a sworn statement of Janice Loudenslager, the property owner and

Pg. 6 of 13

original alleged "victim" of the 911 call (which was made by Bryan Loudenslager, whom was not even at the scene.) Here is one of many pieces of exculpatory evidence which was never used by this attorney. In point (3.) of Affidavit, Attorney claims, "The incriminating film containing the confession was the main evidence," and "...the adverse eyewitness." (Singular, as in "one", the only "eyewitness who was not even present.) And a "confession?" Applicant and ALL evidence reflect that there was NO confession, ever. If there had been a "confession," there would have been no need for any negotiations or plea whatsoever. In point (4.) of Affidavit, a decades-long relationship with Investigator Brittain and the Brittain family has already been established, as has the common knowledge that Investigator Brittain had arrested Judge Cox. For Affiant to state that "...he had not in previous years detained either Judge Cox..." is a fabrication. And in a further and perhaps more

Pg 8 of 13

damning statement, Attorney James states that, "... the facts never took place, and even had it occurred, there were no grounds for a Change of Venue or a Motion to Recuse the Judge." (Emphasis added.)

In Affidavit point (6.), ~~this~~ Attorney James, who is allegedly a defense attorney for Applicant, convicts his own client with conclusive statements in "... the person (he) assaulted was a policeman," and, "... the person assaulted was a peace officer...", When all evidence, including but not limited to the Investigation and reports generated by his own Investigator Gary Fastin, cast serious exculpatory doubt on the entire case. In Affidavit point (7.), ~~this~~ Applicant's Defense Attorney James issues a verdict for the Jury, stating said Jury, "... would have surely sentenced him to substantially more time in prison."

Pg. 8 of 13

Applicant asserts that the scope and content of the entire Affidavit of Attorney James is at best contrived and misleading and at worst a violation of Rules 1.03 and 3.04 (d) of the Texas Disciplinary Rules of Professional Conduct. All files and documents, as well as sworn pleadings, have been submitted to the Chief Disciplinary Counsel of the State Bar of Texas. Applicant asserts that as a ~~basis~~ credible source of facts for the Judge's Order of Denial, it is rather a credible source for the basis of Ineffective Assistance of Counsel as demonstrated herein.

3. In Judge's Order 3.) (Exhibit "E", pg.2), Judge Cox uses semantics to dismiss Applicants' entire familiar employment claim because Applicant erroneously specified his father as being a long time Investigator for the District Attorney rather than the County Attorney's Office. This does nothing to change the overall facts of the claim that

relationship biases very well can ~~exi~~ and do exist in the decades-long relationship between this Judge and Investigator/ Officer Brittain. Judge Cox even goes on to fully ~~the~~ explain that in fact does exist, and a prior arrest of Judge Cox has occurred; and again, Judge Cox's attempt to explain this arrest away with frivolity does not change the facts. Judge Cox would have been no less guilty then had ~~this~~ he and his group of friends gathered to "witness" an aggravated assault rather than an illegal street racing event. Perhaps this is why Investigator/Officer Brittain arrested Judge Cox and his friends at that time. Applicant would ~~like~~ like to illustrate that Judge Cox, Investigator/Police Officer Brittain, and Attorney Tim James have known each other and worked together/apart in the same single Criminal District Court of Nacogdoches County for decades. Tim James was not only personally aware of the relationship (good or bad) between Investigator/ Officer Brittain, by his own sworn admission, it is the reason he took the case pro bono in the first place.

These are not personal musings by Applicant, this is all sworn, documented, and referenced herein. Applicant asked Attorney ~~James~~ James for a Motion for Change of Venue (just at even the very suggestion of Attorney James), but this request and countless other pleadings were never pursued or fulfilled, nor did Attorney James ever bring clearly exculpatory evidence uncovered by Investigator Partin to light.

4. Judges Motion 4.), Judge Cox claims that Applicant was never being interrogated by Deputy in his document marked Exhibit Three, yet in Point 5.) below, the Judge references statements by Officers and Applicant on the video.

5. Judge's Motion 5.), Judge Cox again heavily references the Affidavit of Attorney James as his benchmark. Applicant asserts that he has already herein repeatedly called into question the credibility and validity of

James' Affidavit and its inconsistency with any corroborating, documented facts. Additionally, Applicant would like to clearly emphasize the words of Judge Cox himself here (Exhibit "E", pg. 3) in 5.) of the Judge's Order:

"He states that <u>one</u> of the eye witnesses stated that they saw the Applicant lung (sic) at an Officer with a knife (<u>WHICH IS THE CRUX OF THE INDICTMENT.</u>)" (Emphasis added.)

Applicant has provided documentation herein that there were NO witnesses to the alleged "lunge with a knife at the Officer," the lone exception being the statement by a Deputy who was not even at the scene to witness the alleged attack.

<u>Judge's Order "Conclusions of Law"</u>

1. Judge's Order Conclusions of Law 1.), the Judge clearly states the following, verbatim in his own words, that are but one last clear example

Pg. 12 of 13

of Ineffective Assistance of Counsel; Judge Cox states the following:

1. "In Ground One, the Applicant makes factual claims about his ~~Attorney~~ trial Attorney that if true would most likely constitute ineffective assistance of Counsel."

Applicant contends, that for a preponderance of all evidence and factual documentation he has provided herein, that he has clearly proven his allegations as being TRUE. And therefore, by Judge Cox's own ~~C~~ Conclusions, the Indictment is invalid and that Tim James performance, or lack ~~thereof~~ thereof, was clearly definitive of ineffective assistance of Counsel.

Applicant has begun and will continue to make every effort to the letter of the law, and the State Bar, to correct this injustice, and in fact, denial of due process.

Respectfully submitted,

Kevin Lee Britain

KEVIN LEE BRITTAIN
TDCJ #1915233
CAUSE NO. F12-19562-A

Pg. 13 & 13

## INMATE'S UNSWORN DECLARATION

I, KEVIN LEE BRITTAIN, TDCJ #01915233, being presently incarcerated in the Texas Department of Criminal Justice, Larry Gist Unit, 3295 FM 3514, Beaumont, TX 77705, do solemnly swear under penalty of perjury that the forgoing Applicants Response to Judges Order Denying Writ of Habeas Corpus, and, Memorandum of "Legal Citations and Arguments", are both true and correct in their entirety.

Signed by my hand on this the 30 day of March, 2015.

KEVIN LEE BRITTAIN, EX PARTE
TDCJ # 01915233

RE: Cause No. F1219562-A

STATE OF TEXAS )

NACOGDOCHES COUNTY )

## VOLUNTARY STATEMENT

CASE: S12-09263

DATE: 9-5-12

TIME:

PLACE: 2005 cr 411

MY NAME IS Bryan Loudenslager MY DATE OF BIRTH IS 8/28/1965
I LIVE AT 440 CR 406 Nac TX MY HOME PHONE NUMBER IS
936 564 6192 MY NEAREST RELATIVE IS Brenda Loudenslager
AND THEIR PHONE NUMBER IS 936 556 1507 . I AM GIVING THIS
STATEMENT TO J. Sparks WHO HAS BEEN PROPERLY
IDENTIFIED AS A DEPUTY SHERIFF FOR THE NACOGDOCHES COUNTY
SHERIFF'S DEPARTMENT.

I was called by my daughter Alyssa Loudenslager who lives @
2009 CR 411 Nac, concerning a male subject, Kevin Brittain, who
Alyssa says she Alyssa needed me @ 2009 CR 411 because Kevin was yelling
and cursing. I then immediately called 911 and notified on what was
taking place @ 2009 CR 411. I was again called by Alyssa telling me to
hurry. I arrived and was able to talk with Kevin w/o any incident.
Conversation lasted about 4-5 mins (maybe) Then NSO arrived and
did not follow the officer over to his car as instructed, Kevin then
just disobeyed orders and then pulled a knife when officer got his pepper

Bryan made no
mention of Kevin
hanging at Mclandes
Bryan only mentions Kevin
did not follow orders of
officers not @ the time!

21 seconds

...RGOING STATEMENT WHICH CONSIST OF ___ PAGE(S)
...ORRECT. I GAVE THIS STATEMENT OF MY OWN FREE
...E TRUTH AND I WILL TESTIFY TO THE SAME IN COURT.

_____
PERSON MAKING STATEMENT

– EXHIBIT "A" –
PAGE 1 of 2

0042

spray out. Kevin then pulled out his knife and blade was open. Officer orders Kevin to stop as he came to ~~him~~ the officer. Officer said stop and put down the knife. Kevin said shoot me, Kevin did throw the knife near the house. Officer then holsters weapon and tried to handcuff Kevin but he resisted and officer took Kevin to the ground. Officer was unable to handcuff Kevin and I held Kevin's Ⓔ hands to keep from hitting the officer. 2nd officer arrives and assisted 1st officer in arresting Kevin.

Keep from hitting
officer?

9-9-2012

I, Janice E. Loudenslager, was at my residence at 2009 CR 411. Kevin Brittain arrived at my house at or around 9:30 A.M. as I was getting ready for church. We had decided to break up after a 2 plus year relationship and were separating. He calmly and kindly asked me if he could get his belongings (Ex: clothes, bibles, shoes, ect.) I asked him to hurry and he began to raise his voice at me. When he walked outside with some of his belongings, I closed and locked the door behind him. He stayed outside for about another five minutes, then he left in the direction of his parent's house, who live just down the road from my house. I left and attended church. At approximately 6:00P.M., Kevin came back to my house, unaware that my two daughters Alyssa Loudenslager and Adysson Loudenslager were at home with me. I was standing in my kitchen when he knocked on my front door. I walked into the living room where Alyssa was sitting in the living room floor cutting out pictures for her science project. I opened the front door and Kevin asked to get the remainder of his things, I let him in. I didn't want to have any altercations with Kevin with my daughters there, as we have both agreed to keep our differences away from the girls. I could tell Kevin was emotionally upset. As he got his things, we were both crying and emotional. Adysson, walked up to Kevin and asked "Where is Kolten?" (Kevin's son) "He is with my parents and I just have some things I need to get." He walked into the kitchen and asked me for a trash bag out of the utility room to put his clothes in. I said "yes" and that I would help him. I waited for him to get a bag. Kevin's class ring and a pocket knife were laying on my bar. I handed them both to him and he put them both in his shorts pocket. The longer he was there the more emotional we all became. Kevin walked into our bedroom and opened the chest of drawers where he kept his clothes and began to get them out and putting them into the bag. He walked back into the living room and sat down the bag still looking for all his belongings. I asked him to hurry and that seemed to frustrate him. I could tell he was hurt, I was hurt. The girls were watching and crying. We had been a family for over two years. It was hard to do, especially for my girls. I asked Alyssa to call her dad (Bryan Loudenslager) with the sole intention to have him come over and pick up them and and take them home with him, in order to let Kevin and I talk through things without my girls being present. Alyssa did as I asked. Kevin overheard this and got very upset, not knowing my intentions, I suppose. Kevin has never liked the character of Bryan and always tolerated him for the girls. He began to raise his voice at me wanting to know what I was thinking by calling someone like Bryan at a time like this. Kevin began looking around his room for his things. He lifted the couch looking for the ipad he bought me as a gift, because I sometimes slide it under the couch. Things seemed to become more and more tense, so I again asked Alyssa to call her daddy and make sure he was coming. She did as I asked her. About ten minutes later Bryan and Brenda, his wife, arrived. At this point everyone was upset. Brenda came into the house to get the girls and Bryan stood at the door. Kevin and Bryan walked into the front yard and began

talking as I, Brenda, and my two daughters stayed inside. Kevin and Bryan calmly spoke in the front yard for about five to seven minutes when the police car came barreling into my driveway. I was instantly aggravated, because I knew that Bryan and Brenda must have called them and that is something I did not want to happen. It was uncalled for. I was completely unaware that the officers were called. The officer asked me if we were ok and I said "yes, we are all just fine." He walked over to Bryan and Kevin. They were still having a calm conversation. I saw the Officer put his hand over his pistol and also, I think on his pepper spray. Kevin obviously saw too, and started backing away from the officer slowly into the yard. I could see Kevin's' face was nervous. Kevin stepped at least eighteen to twenty feet from the Officer while the Officer stood still. Then the Officer pulled and pointed his pistol at Kevin and began to yell for Kevin to get on the ground. Kevin said "You haven't even told me what I've done. Please put the pistol away!" Kevin had his hands in the air and I was terrified that the Officer was going to shoot Kevin, Kevin was terrified too. Kevin pleaded with the Officer to put the gun away and that he was unarmed. The Officer asked for any weapons, Kevin responded "No, but I do have a pocket knife you would consider a weapon." Then said "If I get it out I am afraid you will shoot me" the officer screamed for Kevin to get the knife out and throw it. Kevin complied and asked the officer not to shoot. Kevin pulled the knife out of his right bottom pocket of his shorts, the same one I had given him moments before in the kitchen. Bryan began to scream "He's got a knife" and "he's going to shoot him, get inside the house." That made everyone very nervous. Bryan was standing probably five to eight feet from the Officer. The Officer told Kevin he was about to shoot him and Kevin threw the knife away so hard it bounced off the house to the right of Kevin. Kevin didn't charge or lunge at anyone with the knife. He was scared and threw it instantly. I could tell Kevin was terrified. I was terrified. It was horrible to see him this way. Kevin raised his hands, palms up opened and slowly walked towards the Officer. When Kevin was eight to ten feet away from the officer Bryan grabbed Kevin by the arm and the Officer holstered his gun and "bulldogged" Kevin so hard. Kevin slid three to five feet on his back across the yard. Bryan jumped on Kevin and tried twisting his arm behind him. The officer was lying on Kevin as well. Never did the Officer ask for Bryan's help. The second Officer arrived and Bryan started yelling "Taze him, taze him!" and they did over and over and over again. Then Bryan jumped in and started trying to twist Kevin's arm behind him again when he was flat on his back. During that time the second Officer arrived and ran up to them. He hand cuffed Kevin and started Tazing and shocking him over and over again. Kevin's body was locking up. They pulled Kevin up by the handcuffs and tazed him more. Kevin could hardly walk. Kevin has never even acted like would do any harm to me or the girls, and he did not deserve this at all. Kevin has never been anything but a very loving father figure and is my very best friend, who I love dearly. The police should have never been called and I strongly believe that the calls made against Kevin by Bryan / Brenda were unnecessary and very



likely fabricated. Bryan has always tried to destroy and come between every relationship I've had since our divorce. He knew that he could cause a big problem by calling the police, and did just that. Till this day I love Kevin Brittain and trust him completely at my home and to be in company of my daughters with or without my presence. He loves us and we love him deeply. I believe Bryan called the Officer and made false statements that Kevin had "gone crazy" and was vandalizing my home. No wonder the Officers approached Kevin with such force when they arrived. I never saw Bryan or Brenda make a call, so they had to have made the false calls before arriving, as if there was anything to report. Besides, this is my home and Kevin had committed no crime. I just didn't want my girls there while he was getting his things. It was too hard on all of us. I or my daughters have ever been victimalized by Kevin. He loves us, and we love him dearly. Furthermore, I will not pursue charges on any innocent man. Bryan and Brenda are no longer welcome on my property since this happened. Kevin is allowed and always will be. Kevin could've been killed just so Bryan could do what he does best, cause drama. Also my girls think more of Kevin as a father than Bryan anyday.

2-4-13

GARY PARTIN
Notary Public, State of Texas
My Commission Expires
October 02, 2015

2/4/13

EXHIBIT "B"
PAGE 3 of 3

CLIENT: KEVIN BRITTIAN

*INVESTIGATOR*
*GARY PARTIN*

DATE: 12/3/12

AFTER REVIEWING ALL ORIGINAL STATEMENTS, VIEWING THE VIDEO AND INTERVIEWING PERSONS WITH FIRST HAND KNOWLEDGE OF THE BRIEF TIME PERIOD OF THE ALLEGED ASSAULT OF A PEACE OFFICER, PARTIN CAN ONLY FIND ONE MENTION OF A LUNGE OR ANY MOTION TOWARDS DEPUTY MOLANDERS IN ALL THE INFORMATION GATHERED. THIS WAS TWO SENTENCES IN THE PROBABLE CAUSE AFFIDAVIT PREPARED BY DEPUTY MCDONALD, WHO WAS NOT PRESENT IN THE TIME PERIOD THE ACT IS ALLEGED. MCDONALD STATED "DEPUTY MOLANDERS ORDERED THE DEFENDANT TO DROP THE KNIFE'. 'THE DEFENDANT OPENED THE KNIFE AND LUNGED TOWARDS DEPUTY MOLANDERS". "THE DEFENDANT THEN THREW THE KNIFE INTO THE FLOWER BED IN FRONT OF THE RESIDENCE". NO OTHER PERSON SUBMITTING A STATEMENT MADE MENTION OF A LUNGING TOWARDS THE DEPUTY MOLANDERS. ONE PORTION OF THE CASE REPORT AS SUBMITTED BY MCDONALD REFERS TO BRITTIAN LUNGING AND THROWING AWAY THE KNIFE. IT APPEARS THAT KEVIN BRITTIAN WAS ATTEMPTING TO KEEP THE DISTANCE BETWEEN HIMSELF AND DEPUTY MOLANDERS GREAT ENOUGH THAT MOLANDERS COULD NOT PEPPER SPRAY OR TAZE HIM. PARTIN NOTED NO ACTION OF DEPUTY MOLANDERS TO RETREAT BACK FROM A LUNGE WITH A KNIFE. THE ACTION NOTED ON THE VIDEO WAS MOLANDERS REHOLSTERING HIS DUTY FIREARM AND THEN ADVANCING RAPIDLY IN THE DIRECTION BRITTIAN IS LOCATED AT THIS TIME. THE EX-HUSBAND OF JANICE LOUDENSLAGER GRABBED THE LEFT ARM OF KEVIN BRITTIAN AFTER BRITTIAN THROWS AWAY THE KNIFE AND HELD BRITTIAN IN A FIXED POSITION UNTIL DEPUTY MOLANDERS COULD RUN TO THE SPOT BRITTIAN AND LAGENSLAGER WERE STRUGGLING AND JUMP ON BRITTIAN IN AN ATTEMPT TO "TAKE BRITTIAN TO THE GROUND". THE ATTEMPT OF MOLANDERS TO TAKE DOWN BRITTIAN WAS SLIGHTLY

*EXHIBIT "C"*
*PAGE 1 OF 7*

MISCALCULATED AND MOLANDERS FELL TO THE GROUND
LANDING ON HIS SHOULDER, THEREBY INJURING HIMSELF.

IN THE REPORT, MCDONALD WRITES "DEPUTY MOLANDERS
ORDERED KEVIN TO DROP THE KNIFE AS KEVIN WAS BACKING
AWAY FROM DEPUTY MOLANDERS. KEVIN THEN LUNGED AT
DEPUTY MOLANDERS AND TOSSED THE KNIFE INTO THE
FLOWER BED." IT APPEARS THAT BRITTIAN CONTINUED TO
MOVE AWAY FROM MOLANDERS DURING THE ENTIRE ACTION
UNTIL BRITTIAN WAS GRABBED BY BRYAN LAGENSLAGER. IT
SEEMS LAGENSLAGER MADE THE INITIAL ASSAULT ON
BRITTIAN, HOLDING HIM UNTIL MOLANDERS COULD CATCH UP
WITH BRITTIAN AND ATTEMPT TO TAKE HIM TO THE GROUND.
BY WITNESS STATEMENTS AND OFFICERS STATEMENTS, KEVIN
BRITTIAN NEVER ATTEMPTED PHYSICAL CONTACT WITH
DEPUTY MOLANDERS, BUT CONTINUED TO KEEP A DISTANCE
SAFE FROM THE PEPER SPRAY OR TAZER OF MOLANDERS.
PARTIN BELIEVES BRITTIAN DID NOT LUNGE AT MOLANDERS
AT ALL, BUT CONTINUED MOVING OUT OF RANGE OF THE
PEPER SPRAY. BRITTIAN DID THROW THE KNIFE AWAY FROM
HIS POSSESSION IN A RAPID MANNER IN THE FEW SECONDS THE
ENTIRE INCIDENT LASTED. TWO WITNESSES STATE THAT
BRITTIAN BEGAN TO WALK TOWARD MOLANDERS WITH HIS
HAND EXTENDED PALMS UP TO SURRENDER WHEN BRYAN
LOUDENSLAGER GRABBED BRITTIAN'S ARM AND BEGAN TO
STRUGGLE WITH BRITTIAN. THE ENTIRE INCIDENT LASTED
VERY FEW SECONDS.

THE ORIGINAL REPORT HAS MANY FALSEHOODS WRITTEN INTO
THE BODY OF THE REPORT. THE SHERIFF'S DEPARTMENT
VIDEO, EVEN THOUGH DOES NOT SHOW 100 PER CENT OF THE
INCIDENT DOES DISPLAY ENOUGH TO SHOW THE FALSEHOOD
ENTERED BY THE SUBMITTING DEPUTY.

AS FOR THE KNIFE SAID TO HAVE BEEN USED TO LUNGE AT
DEPUTY MOLANDERS, MOLANDERS HAD ASKED BRITTIAN IF HE
HAD ANY WEAPONS AND BRITTIAN HAD VOLUNTEERED THAT
HE HAD A KNIFE. MOLANDERS TOLD BRITTIAN TO TAKE OUT
THE KNIFE AND THROW IT AWAY, WHICH BRITTIAN DID. WHEN
BRITTIAN PULLED THE KNIFE OUT OF HIS PANTS POCKET,

EXHIBIT "C"
Pg. 2 of 7

BRYAN LOUDENSLAGER STARTED YELLING REPEATEDLY "HE'S GOT A KNIFE"! "HE'S GOT A KNIFE"! OTHER WORDS WERE SAID BY LOUDENSLAGER SUCH AS "GET DOWN, HE'S GONNA SHOOT HIM"! BRITTIAN THREW THE KNIFE AS FAR AWAY FROM HIMSELF AS HE COULD AND ASKED DEPUTY MOLANDERS DON'T SHOOT ME, I HAVE A LITTLE SON AT HOME, PLEASE DON'T SHOOT ME! ABOUT THIS TIME, BRYAN LOUDENSLAGER GRABS BRITTIAN BY THE LEFT ARM AND HOLDS BRITTIAN UNTIL DEPUTY MOLANDERS CAN ADVANCE AND JUMP ON BRITTIAN AFTER HAVING REHOLSTERED HIS DUTY FIREARM. MOLANDERS ENDS UP TANGLED UP WITH BRITTIAN AND LOUDENSLAGER ON THE GROUND. MOLANDERS FALLS ON THE GROUND AND HURTS HIS SHOULDER. LOUDENSLAGER ATTEMPTS TO GET BRITTIAN'S ARMS BEHIND HIS BACK TO CUFF BRITTIAN, BUT THE INJURED DEPUTY IS LAYING ON BRITTIAN IN SUCH A MANNER THAT HOLDS BRITTIAN'S ARMS IN A FIXED POSITION. ABOUT THIS TIME, DEPUTY MCDONALD ARRIVES ON THE SCENE AND IS TOLD BY BRYAN LOUDENSLAGER "TAZE HIM"! TAZE HIM"! MCDONALD TAZES BRITTIAN SEVERAL TIMES AND THE BODIES BECOME UNTANGLED. BRITTIAN IS SUBDUED AND PLACED IN THE PATROL UNIT OF MCDONALD.

PARTIN BELIEVES THAT BRYAN LOUDENSLAGER RECEIVES A TELEPHONE CALL FROM ALYSSA LOUDENSLAGER TO COME GET THE TWO GIRLS WHILE JANICE LOUDENSLAGER AND KEVIN BRITTIAN TRY TO WORK OUT THEIR PERSONAL PROBLEMS WITHOUT THE TWO YOUNG GIRLS BEING PRESENT. BRYAN LOUDENSLAGER CALLS 911 AND ADDS TO THE STORY ENOUGH TO CAUSE DISPATCH TO BELIEVE THERE IS A DISTURBANCE IN PROGRESS AT 2009 CR 411 EVEN THOUGH HE IS NOT PRESENT AT THIS LOCATION. WHEN BRYAN LOUDENSLAGER RECEIVES A SECOND CALL FROM ALYSSA TO CHECK TO SEE IF HE DID GET STARTED TO THE HOUSE, HE TAKES WHAT INFORMATION ALYSSA GIVES HIM AND ADDS TO THAT STORY WHEN HE CALLS BACK TO 911. THE INFORMATION NOW GIVEN TO DISPATCH IS THAT KEVIN BRITTIAN HAS GONE CRAZY AND IS VANDALIZING THE HOUSE AND DISPATCH PASSES THAT INFORMATION ON TO THE YOUNG INEXPERIENCED PATROL DEPUTIES. BY THIS TIME THE


EXHIBIT "C"
Pg 3 of 7

PROBLEM IS TOTALLY BLOWN OUT OF PROPORTION. FROM LISTENING TO THE RADIO TRAFFIC ON THE VIDEO, PARTIN CAN HEAR THE CALL SOUNDING VERY SERIOUS. WHEN MOLANDERS PULLS UP TO THE SCENE, KEVIN BRITTIAN AND BRYAN LOUDENSLAGER ARE STANDING ON THE SIDEWALK BY THEMSELVES HAVING WHAT APPEARS TO BE A CONVERSATION. MOLANDERS STOPS A SHORT DISTANCE FROM THE TWO MEN AND THEN WALKS UP DIRECTLY BETWEEN THE TWO MEN HE MOST LIKELY DOES NOT KNOW. HE NEXT HAS A WORD OR TWO WITH A FEMALE BELIEVED TO BE JANICE LOUDENSLAGER. MOLANDERS THEN ATTEMPTS TO APPROACH THE TWO MEN AND KEVIN BRITTIAN BEGINS TO MOVE AWAY FROM MOLANDERS. THERE IS NO SOUND ON THE VIDEO. ALL OF A SUDDEN THINGS GET CRAZY AND BRITTIAN KEEPS MOVING AWAY FROM MOLANDERS. MOLANDERS CAN BE SEEN DRAWING HIS DUTY FIREARM AND THEN A VERY SHORT TIME LATER REHOLSTERING THE WEAPON. THIS ACTION CAUSES PARTIN TO BELIEVE BRITTIAN HAS DISCARDED THE KNIFE AS ORDERED BY MOLANDERS. MOLANDERS ARRIVED AT THE LOCATION AT 1829 HOURS. AFTER SHORT VERBAL CONTACTS WITH AT LEAST THREE PERSONS AT 1829:56, MOLANDERS DRAWS HIS FIREARM (APPEARS TO BE GIVING VERBAL COMMANDS) THEN REHOLSTERS HIS WEAPON AT 1830:17 (A SIGN THAT BRITTIAN HAS DISCARDED THE KNIFE, FOLLOWING MOLANDERS' ORDERS). MOLANDERS HAS HIS WEAPON OUT OF THE HOLSTER FOR TWENTY ONE SECONDS ONLY. TWENTY ONE SECONDS SEEMS TO BE A PRETTY FAST RESPONSE TIME TO GET RID OF A WEAPON.



EXHIBIT "C"
Pg 4 of 7

1838:59 (CONVERSATION BETWEEN OFFICERS AND BURL EVANS) "HE'S GOING TO JAIL, AGGRAVATED ASSAULT ON PEACE OFFICER WITH A KNIFE AND BURGLARY HABITATION"

1839:35 CONVERSATION BETWEEN OFFICERS? "WE'VE GOT BOH AGGRAVATED ASSAULT ON PEACE OFFICER." NOBODY GOT INJURED BUT"

1843:46 MCDONALD LEAVES SCENE TO TRANSPORT BRITTIAN TO JAIL.

AT NO PLACE IN THE VIDEO TAKEN BY MOLANDERS' UNIT COULD ANY INDICATION OF A "LUNGE" BE SEEN AS MOLANDERS SAID KEVIN BRITTIAN DID WITH THE KNIFE. DURING THE TIME MOLANDERS ADVISED BRITTIAN LUNGED WITH THE KNIFE, MOLANDERS WAS IN THE PROCESS OF PUTTING HIS SIDEARM BACK IN THE DUTY HOLSTER. IF A LUNGE WITH A KNIFE HAD OCCURRED AT ANY TIME DURING AN ARREST, IT IS UNREASONABLE THAT AN OFFICER COULD REHOLSTER HIS WEAPON AND PROCEED TO TAKE A SUSPECT TO THE GROUND BY JUMPING PHYSICALLY ON THE SUSPECT.

NO MIRANDA WARNING NOTED MCDONALD ASKED QUESTIONS DURING TRANSPORT

CHARGES ACTUALLLY FILED

CRIMINAL TRESPASS "A"

RESISTING ARREST OR TRANSPORT "A"

AGGRAVATED ASSAULT OF PUBLIC SERVANT "F1"

THE PLAYERS IN THIS INCIDENT ARE IDENTIFIED AS FOLLOWS:

KEVIN LEE BRITTIAN, WM, 7/1/75 ALLEGED ACTOR

JANICE EDWINDA EMERSON LOUDENLAGER, WF, 11/22/72, ALLEGED VICTIM


EXHIBIT "C"
Pg. 5 of 7

ALYSSA ERIN LOUDENLAGER, WF, 1/18/99, DAUGHTER OF BRYAN AND JANICE LOUDERLAGER

ADYSSON LOUDENLAGER, WF, 6/22/07, DAUGHTER OF JANICE AND DRYAN LOUDENLAGER

KOLTEN BRITTIAN, WM, 2/1/10, SON OF KEVIN BRITTIAN AND HOLLY SCOGGINS

HOLLY SCOGGINS, WF, EX-GIRLFRIEND OF KEVIN LEE BRITTIAN AND MOTHER OF KOLTEN BRITTIAN, PRIMARY COUSTODIAN OF KOLTEN BRITTIAN  HOLLY SCOGGINS CONTACTED PARTIN BY TELEPHONE AND WANTED TO TELL PARTIN OF THE PLANS SHE AND BRYAN LOUDENLAGER DISCUSSED TO USE KEVIN BRITTIAN AS A REASON TO GET CUSTODY OF ALYSSA LOUDENLAGER AND  ADDYSON LOUDENLAGER FROM JANICE LOUDENLAGER. SHE SAID THAT BRYAN LOUDENLAGER WANTED THE PORTRAY KEVIN BRITTIAN AS A BAD PERSON THAT IS HAVING A BAD EFFECT ON THE TWO YOUNG GIRLS. SHE ALLOWED THAT SHE WOULD TESTIFY TO THOSE DISCUSSIONS BETWEEN HERELF AND BRYAN LOUDENLAGER. SHE TOLD PARTIN THAT KEVIN HAD BEEN CLEAN AND SOBER SINCE THE BIRTH OF HIS SON, KOLTON.

OTHER WITNESSES MAY BE DISCOVERED THAT WOULD AID IN THE DEFENSE OF BRITTIAN.

DEPUTIES INVOLVED IN INCIDENT:

DEPUTY STEVEN MOLANDERS, NEW HIRE WITH ALMOST NO EXPERIENCE ON THE STREET. FORMER OCCUPATION WAS THAT OF A "RAPPER", TRAVELING WITH AND DOING "HIP HOP" SHOWS WITH BLACK ENTERTAINERS. STEVEN MOLANDERS IS THE NEPHEW OF DEPUTY KENNETH KING ON NCSO. MOLANDERS APPEARS TO PARTIN TO BE PRETTY IMMUTURE AND TOO INEXPERIENCED TO WORK ALONE ON THE STREETS. DURING THIS INCIDENT, MOLANDERS USED VERY POOR TACTICS IN CONTROLING THE SCENE. HIS INJURY WAS MOST LIKELY DUE TO HIS ATTEMPT TO JUMP ON BRITTAIN AND TAKE HIM DOWN TO THE GROUND. MOLANDERS WAS SAID BY AT



EXHIBIT C
Pg. 6 of 7

LEAST TWO PERSONS TO HAVE LANDED ON HIS RIGHT
SHOULDER AS HE FELL ON TOP OF BRITTIAN.

DEPUTY AUSTIN MCDONALD, MAY HAVE A YEAR ON THE
STREETS WITH NCSO. HE WAS A RESERVE FOR A WHILE AND
MAY HAVE WORKED IN THE JAIL. MCDONALD OFTEN RODE
WITH SEVERAL OFFICERS WHILE HE WAS A RESERVE. HE IS
MOST LIKELY A BETTER DEPUTY THAN MOLANDERS.
MCDONALD COMES FROM A TROUBLED HOME IN GARRISON
WITH PARENTS DEEPLY INVOLVED IN SUBSTANCE ABUSE. HE IS
A PERSON WELL KNOWN TO PARTIN. AUSTIN MCDONALD WAS
RAISED BY HIS PATERNAL GRANDPARENTS WHO WERE GOOD
CHRISTIAN PEOPLE.

DEPUTY 525 WHO WAS THE LAST DEPUTY TO RESPOND TO THIS
LOCATION IS A PERSON UNKNOWN BY PARTIN. HIS ACTIONS ON
THE VIDEOS CAUSE PARTIN TO BELIEVE HE IS AN EXPERIENCED
STREET OFFICER.

THE DISPATCHER WORKING THIS EVENT IS SAID TO BE COLTON
MURRAY WHO IS CURRENTLY WORKING NIGHTS AT THE NCSO
LEC JAIL. AFTER PARTIN LEARNS MORE ABOUT THE PHONE
CALLS BETWEEN ALYSSA LOUDENLAGER AND BRYAN
LOUDENLAGER, PARTIN WILL ATTEMPT TO INTERVIEW
MURRAY.

EXHIBIT "C"
Pg. 7 of 7



# NACOGDOCHES COUNTY SHERIFF'S OFFICE

Warrantless Arrest Probable Cause Affidavit

State of Texas

County of Nacogdoches

Cause #: _____

Case #: _____

The undersigned, *Austin McDonal*, of the NACOGDOCHES COUNTY SHERIFF'S OFFICE under oath states that there existed probable cause for the arrest without warrant of the person named below based upon the following:

Name of arrestee: KEVIN L. BRITTAIN

Date of arrest: 09/09/12

Place of arrest: 2009 CR 411

DOB: 07/01/75

Time: 19:09:01

The above-named person is currently being detained on the following charges:

| Offense | Date/Time | Statute Code | CC | Bail Amt |
|---|---|---|---|---|
| 1.AGG ASSAULT AGAINST PUBLIC SER | 09/09/12 19:12:03 | 22.02 (b)(2)(B) | F1 | |
| 2.CRIMINAL TRESPASS HABIT/SUPERF | 09/09/12 19:13:33 | 30.05 (a)(1)(2) | MA | |
| 3.RESIST ARREST SEARCH OR TRANSP | 09/09/12 19:20:18 | 38.03(a) | MA | |

The undersigned believes that probable cause existed for this warrantless arrest and the continued detention of the above-named person based upon the following information which was either known by the undersigned personally or was obtained by the undersigned in his/her capacity as a peace officer:

on 09/09/12 at approx 1815 hours deputies were dispatched to the 2000 blk of cr 411 in reference to a disturbance in progress. Upon arrival deputy molanders # 532 observed male and female subject yelling at each other on porch. Deputy molanders ordered the defendant to step away from the porch and speak with deputy molanders. the defendant refused and reached in his pocket. Deputy molanders drew his duty weapon and ordered the defendant to keep his hands out of his pockets, when the defendant pulled a knife from his pocket. deputy molanders ordered the defenant to drop the knife. The defendant opened the knife and lunged towards deputy molanders. The defendant then threw the knife into the flower bed in front of the residence. Deputy molanders took the defendant to the ground in attempt to arrest him. deputy mcdonald arrived and observed the defendant resisting and pulling away from deputy molanders on the ground. deputy mcdonald drive stunned the defendant with his duty taser in attempt to have the defendant comply. deputy molanders was hospitalized due to injuries he suffered during the incident. deputy mcdonald spoke with the victim of the disturbance who stated that the defendant entered her residence to get his things but refused to leave. The defenant was yelling and vandalized the inside of the residence.

The undersigned requests the magistrate to whom this statement is presented to execute an order determining that probable cause existed for the above-described warrantless arrest, authorizing the continued detention of the above-named person on the stated charges, and setting appropriate bail, if any.

_____
Officer    531

*Deputy McDonald #531 was NOT even on the scene of incident at the time he alleges herein he WITNESSED Defendant "lunge" at Molanders, and, he is the ONLY witness who stated this.*

EXHIBIT "D"
Pg. 1 of 1

0140

CAUSE NO. F1219562-A

EX PARTE: § IN THE 145TH JUDICIAL

§ DISTRICT COURT OF

KEVIN LEE BRITTAIN

§ NACOGDOCHES COUNTY

ORDER DENYING APPLICATION FOR WRIT OF HABEAS CORPUS
WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

On this the 10th day of February, 2015 came on to be considered Relator's application for Writ of Habeas Corpus filed on February 3, 2015. The Court has carefully considered the Relator's Application for Writ of Habeas Corpus, the attached exhibits, the sworn pleadings, the Counsel's personal recollection, and finds that the Application is unfounded in fact and/or law and should be denied. Therefore, the relief sought in the Application is hereby DENIED. The findings of fact and conclusions of are set forth below

FINDINGS OF FACT AND CONCLUSIONS OF LAW

FINDINGS OF FACT

1. The Applicant is a repeat offender who was placed on probation for Aggravated Kidnapping back in 2000 and later revoked in 2004. He received a five year sentence for his case when his probation was revoked. In Ground Two of his application, the Applicant claims that I, the trial judge, recused myself in that matter. After reviewing the papers in that prior case it is clear that I never recused myself.

2. In Ground One the Applicant complains that his trial attorney was ineffective by telling him that he could not get a fair trial, and that he would receive a 99 year sentence or a

EXHIBIT "E"
Page 1 of 3

life sentence if he did not take the five year sentence that the State was offering. The Applicant also claims that he did not have time to look for another lawyer because his attorney used up all of his available time on the case. His trial counsel, Tim James is Board Certified in criminal law. Based on the affidavit of Mr. James (attached as Exhibit #1), the Court finds that Mr. James never said that the Applicant could not get a fair trial nor that he would receive a sentence of 99 years or life in prison. Based on the affidavit of Mr. James, the Court finds that the Applicant was given several months to consider the 5 year plea bargain and that he was advised by Mr. James to talk to other attorneys about his case.

3. In Ground Two, the Applicant claims that his father is an investigator for the Nacogdoches District Attorney's Office. The court finds that his father is an investigator for the Nacogdoches County Attorney's Office. Therefore, the claim regarding his father's employment is false. The Applicant goes on to claim that his father had detained both the District Attorney and me during a disturbance. This is absolutely false. There has never been any disturbance involving me and the District Attorney. The Applicant claims that his attorney knew all of this and said that he would file a motion to have the case transferred to another court; however he failed to do this. Based on the attorney's affidavit, the Court finds that this claim is false.

Furthermore, the applicant's father did detain me once but it had nothing to do with the District Attorney. Here are the details of that temporary detention. In either 1978 or 1979 a group of fifteen to twenty teenage boys, including myself, gathered after a Key Club meeting to watch two other boys race their cars on the Loop in Nacogdoches. After the two boys raced by, Officer Brittain (the Applicant's father, then an officer for the Nacogdoches Police Department) drove up beside the group and detained all of us. We were instructed to drive to the police station. We did as we were told. At the police station, two of us asked to see a copy of the law that they were holding us under. They indicated that they were holding us for "participating" in an illegal street race. We pointed out that we were merely observing and not participating. The officers agreed and let us go. Ever since then the Applicant's father and I have often joked that he is the only person to arrest this District Judge. Investigator Brittain and I have a good relationship and kid each other on a regular basis. There are no hard feelings by me that would prevent this Applicant from receiving a fair trial in my court.

4. In Ground Three, the Applicant complains that his counsel failed to appeal the fact that I denied a motion to suppress. The counsel could not appeal because part of the 5 year plea bargain offer was that the Applicant would not appeal the denial of his motion to suppress. (See the Applicant's Certification regarding appeal marked as Exhibit 2.) The Applicant's attorney asked me at some point to make Findings of Fact and Conclusions of Law regarding the motion to suppress. I did so and they are marked as Exhibit Three.

5. The Applicant complains in Ground Four that his attorney told him that he could not win his case due to the facts of his prior felony conviction, that the jury would be older Republicans, and because the victim was a "cop". In his affidavit Mr. James states that in

EXHIBIT "E"
Pg. 2 of 3

his opinion the Applicant would have had a difficult time obtaining an acquittal due to the facts of the case. This includes the statements of the officers involved and the tape including the statement of the Applicant. He states that one of the eye witnesses stated that they saw the Applicant lung at an officer with a knife (which is the crux of the indictment). He also was concerned with the fact that if the Applicant took the stand the State could use his prior felony conviction to impeach him. He states that the Applicant made the decision to take the 5 year plea bargain because he knew that a jury verdict would place him in prison far longer than the minimum which he received. The Court finds that the Applicant decided to plea due to the facts of the case and because of the fact that the State could have used his prior conviction to impeach him. There was no unfair coercion by his counsel.

## CONCLUSIONS OF LAW

1. In Ground One, the Applicant makes factual claims about his trial attorney that if true would most likely constitute ineffective assistance of counsel. However, the Court finds these factual allegations to be false, therefore the Court does not have to make any conclusions of law as to these allegations.

2. The same points made in Ground One apply to Ground Two.

3. In Ground Three, the Applicant claims that his attorney should have appealed the trial Court's decision denying his motion to suppress. As mentioned in the findings the attorney could not appeal the Court's ruling because it was part of the plea bargain that the Applicant was giving up his right to appeal all issues. Therefore there was no ineffectiveness of counsel.

4. In Ground Four, the same points made in Grounds One and Two apply to Ground Four.

A copy of this order shall be furnished to the Honorable Nicole Lostracco, District Attorney

for the 145th Judicial District Court and the Applicant, Kevin Lee Brittain, TDCJ

#1915233, Larry Gist Unit, 3295 FM 3514, Beaumont, TX 77705.

Signed and entered this the _10_ day of February, 2015.

CAMPBELL COX
DISTRICT JUDGE

EXHIBIT "E"
Pg. 3 of 3

## NO. F12-19562-A

| STATE OF TEXAS | § | IN THE 145TH DISTRICT COURT |
|---|---|---|
| ~~vs.~~ | § § § | ~~OF~~ |
| KEVIN LEE BRITTAIN | § § | NACOGDOCHES COUNTY, TEXAS |

## AFFIDAVIT

My name is Tim James, I am an attorney in Nacogdoches, Texas. I am a Board Certified criminal defense lawyer and I have been practicing for 45 years. I am making this affidavit freely and voluntarily and am stating as follows: *[handwritten notes]*

1.    I took this case *pro bono* out of respect for Kevin Brittain's family. From the earliest time, I informed him that he had significant exposure because of the fact that he did have a knife and he was recorded after his arrest at the patrol car telling the arresting officer that when the officer pulls a gun on him he will pull his knife on the officer. He then apologized to the officer. *[handwritten: I was answering incriminating questions... Why would you bring a knife to a gun fight, I never said I did this but would. No Miranda warning]*

We interviewed all of the witnesses and the arresting officers and it appeared from all of the witness statements, that either the witnesses did not see the actual confrontation with the knife or did not agree with Mr. Brittain's version that he only threw the knife in a flower bed and that it had opened accidentally as he was pulling out. One witness even stated that Mr. Brittain *[handwritten: hearsay]* pulled the knife out and lunged at the Deputy. We reviewed the videotape and based on the tape and the witness statements, we again emphasized to Mr. Brittain that this was a very serious case. *[handwritten: That it was sloppy police work, bs, and he would get it thrown out, not to worry]* *[left margin handwritten: The police lied in their reports]*

2.    We negotiated the State's offer from 15 years down to 5 years, which was the minimum for an enhanced Assault on a Public Servant case. We relayed this offer to Mr. Brittain several months before his plea and continued to meet with him and discuss the case. *[handwritten: Told me the case would be dismissed till weeks before trial date.]*

EXHIBIT "F"

~~EXHIBIT~~ Pg 1 of 3

3.    Mr. Brittain had ample time to talk with any other lawyer and we in fact encouraged him to do so, to see if anyone else had any ideas that would be of benefit. I do not know whether he spoke with anyone else, but there were no other alternatives other than to try his case to a jury. We set this case for a Motion to Suppress. The incriminating film containing the confession, was the main evidence. The Motion was overruled by the judge and the case was then set on the jury trial docket. It was then up to Mr. Brittain as to whether he wished to go to a Jury trial. He continued to ask us our opinion and we continued to tell him that he was probably going to lose the case based on the statements contained in the tape and the testimony of the two Deputy sheriffs and the adverse eye witness. We also explained this to his family.

4.    Mr. Brittain's father was not an investigator for the District Attorney's office and he had not in previous years detained either Judge Cox or District Attorney Nicole LoStracco. This allegation was never made to us by Kevin Brittain and was never presented by him as any grounds supporting any request for a Change of Venue or Motion to Recuse. Such conversation never took place, the facts never took place, and even had it occurred, there were no grounds for a Change of Venue or a Motion to Recuse the Judge.

5.    After the adverse ruling on the Motion to Suppress, the next step in the case would be the trial of the case. A Motion to Suppress cannot be appealed by the defendant before trial, but must be carried along through the trial and made a part of any subsequent appeal if there is an adverse verdict at trial.

6.    In evaluating the case, it was obvious after investigation, after reports, after extensive work, (all of which is reflected in our file) that Mr. Brittain would have a very difficult time obtaining an acquittal from a Jury. This was based on the facts of the case, not on the fact that he had a prior conviction or that the person assaulted was a policeman. Those factors would probably play into some of the decision-making by a jury, but in a case of this nature, the big dilemma would be whether or not Mr. Brittain would choose to testify because by doing so

EXHIBIT "F"

Pg. 2 of 3

his prior conviction would be placed in evidence before the jury. It would be naïve to assume a jury would not consider that he was a prior convict and that the person assaulted was a peace officer with no prior criminal background. Kevin Brittain's decision to plead guilty was based on the fact that he understood a jury verdict would probably place him in prison for a very substantial amount of time and almost certainly would be far more than the offer that was negotiated at the minimum limit.

7.    All efforts, investigations, and strategies were done on Mr. Brittain's behalf. He received excellent representation and a thorough investigation and evaluation of his case. It was his decision based on our mutual analysis of the case to accept the plea and to avoid exposure to a jury, which would have surely sentenced him to substantially more time in prison.

_____
Affiant

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this the 4TH day of FEBRUARY , 2015.

JOY JUELSON
Notary Public, State of Texas
My Commission Expires
May 25, 2016

_____
Notary Public, State of Texas

EXHIBIT "F"
Pg. 38/3

# MEMORANDUM

(I.)

## Argument, Law & Authority

1. The Texas Constitution Provides that,
2. the people shall be secure in their persons,
3. papers and Possessions, from All unreason
4. able seizures or searches, and no warrant
5. to search any Place, or to seize any person
6. or thing, shall issue without describing
7. them As near As may be, nor without
8. probable cause, supported by or affirm-
9. ation. Tex. Const, ART I, §9..

10. _"False Arrest" & "Warrantless Arrest"_

11. Petitioner Asserts & contends that upon
12. the Arrival of officer Molander's at the home
13. of Ms. Janice Loudenslager and Kevin Brittian,
14. officer Molander's violated the right of Kevin
15. Brittian, according to Tex. Const. Art. I, §9, when
16. officer Molanders' did not identify himself,
17. nor did Molander state his reason for
18. being there. He came straight at Kevin Brittian
19. ordering him to go and stand by his patrol
20. Car. The objective test in a consensual encounter
21. is whether a reasonable person would think
22. that he were free to go. The following Are sugg-
23. estions for the law enforcement officer to estab-
24. lish a consensual encounter:

Constitutional Law, The government's actual or effective acquisition of private property either by ousting the owner or by destroying the property or severely impairing its utility. There is a taking of property when government action directly interferes with or substantially disturbs the owner's use and enjoyment of the property. (Also termed constitutional taking). The IV [1791] Amendment, states that, No person shall be denied the right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. Tex. Const. Art. 1, § 9. There was in fact a illegal search & seisure at the home of Kevin & Janice. See Kaupp V. Texas 538 U.S. 629 [Pg. 1848-1848]. A seizure of the person within the meaning of the fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he-

was not at liberty to ignore the police presence and go about his business. Florida V. Bostick 501 U.S. 429, 437, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (quoting Michigan V. Chesternut, 486 U.S. 567, 569, 108 S. Ct. 1975, 100 L. Ed. 2d 565. This test is derived from Justic Stewart's opinion in United States V. Mendenhall, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497. SEE: California V. Hodari D., 499 U.S. 621, 627-628, 111 S. Ct. 1547, 113 L. Ed. 2d 690. Which gave several [E]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, including "the Threatening presence of the officer or officers", "the display of a weapon by an officer," "some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, supra, at 554, 100 S. Ct. 1870. Petitioner contends and asserts that the police officer [Molander] investigative procedure was so qualitatively and quantitatively that it became so intrusive; that, it became disrespectful to Pititioners Rights of freedom of movement, and privacy interests-

as, to trigger the full protection of the fourth and fourteenth Amendments). It cannot (molander) seriously be suggested that when the detectives began to order Petitioner, a reasonable person in his situation would have thought he was standing in his front yard as a matter of choice, listening to officer Molander's investigative conversation, and free to change his mind and go home to in the house at any time!... SEE, HAYES, SUPRA, AT 815-816, 105 S.Ct. 1643.

Ineffective Assistance of Counsel. (II.) "Wrongful use of Judicial Process."

If there is a false Arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be base on a Malicious prosecution claim and on the wrongful use of Judicial Process Rather than detention itself. SEE: KEETON, SUPRA, §119, at 888; 8 SPEISER, SUPRA, §28.15 at 80. SEE: Albright v. Oliver, 510 U.S. 266-275, 114 S.Ct. 807.

Petitioner Assert and Contends that his Attorney Tim James did in fact render Ineffective Assistance of Counsel.

PAGE (4) of (9)

## "Criminal Law § 46.4 - Counsel's duties."

1. In representing a criminal defendant,
2. counsel owes the client a duty of loyalty,
3. a duty to avoid conflicts of interest, a duty
4. to advocate the defendant's cause, a duty
5. to consult with the defendant/Petitioner on
6. important decisions & matters, a duty to keep
7. defendant informed of important developments
8. in the course of the prosecution, and a duty
9. to bring to bear such skill and knowledge as
10. will render the trial a reliable adversarial
11. testing process.

## "Counsel's Investigations"

13. Inquiry into criminal defense, counsel's
14. conversations with the defendants may be critical
15. to a proper assessment of counsel's investigation
16. decisions, since when the facts that support a
17. certain potential line of defense are generally
18. known to counsel, because of what the defendant/
19. Petititioner has said! "Counsels-prejudice"
20. The test for prejudice resulting from the
21. Ineffectiveness of criminal defense counsel require
22. the defendant to show that there is a reasonable
23. probability that, but for counsel's unprofess-
24. ional errors, the result of the proceeding
25. would have been different.

See: Ex-parte Wilson, 724 S.W. 2d. 72. 73.

A defendant's election to plead guilty or Nolo contendere Pro bono, when based upon erroneous advice of counsel, is done Voluntarily and Knowingly. On review of the record, the court found that the state court took no remedial action although it had actual Knowledge that Petitioner had received Constitutionally ineffective assistance of Counsel, as it is evidence from the courts decision and out come.

Petitioner's asserts and contends that the criminal justice system has so grossly malfunctioned that the state's subsequent imprisonment of the defendant is a Violation of dueprocess. U.S. Const. Amend. XIV state action is present, not because a state official knew or should have known the particulars of the unfairness but because the system has failed. See: Cantrell V. Alabama, 546 F.2d 652, 653.

Petitioner admits that his attorney Tim James did do the necessary investigation on the case to prove Petitioner's innocence. However, Counsel failed to represent the-

EVIDENCE collected toward the Petitioners. innocence. Which cause Petitioner Collateral consequences. The STATE ACTIONS ARE PRESENT, not because the whole proceeding is "fundamentally unfair" but rather because a state offical knew or should have known of the "particulars of the unfairness." Id. The language of Fitzgerald v. Estelle, SUPRA. quoted in Cantrell v. Alabama, SUPRA, concerning the Sixth Amend. denial of assistance of counsel. is to find state involvement in retained or court Appointed counsel's conduct which is Adjudged to be less than reasonably effective. Therefore if the trial judge or the prosecutor can be shown to have actually known that a particular defendant is receiving incompetent representation and takes no remedial action, the state action requirement is satisfied. If they directly participate in the incompetency, it is even so. It is abundantly clear that the County Court of Nacogdoches, Tx. had actual knowledge [**4] that petitioner was receiving incompetent representation and took no remedial action. SEE: Cantrell, SUPRA, 546 F.2d At 654.

Page (7) of (9)

Petitioner Asserts and contends that his Counsel "did not" ask the necessary questions during voir dire of the examination of the witnesses, Also, Attorney Tim James did fail to act for the safety of the outcome of the Petitioners Rights, by not questioning the witnesses for the Defendant [Kevin Brittain] in a Motion for discovery hearing, which is the Petitioners Rights to Due Process of Law. That would have conducted a legal proceeding to established rules and principles for the protection and enforcement of private rights, including notice and the right to a fair hearing before a tribunal with the power to decide the case. Petitioner has all of the evidence to prove his innocense on the false charge that the Petitioner is presently doing time for. Which did in fact come from Petitioners Counselor [Tim James]. This leaves the Petitioner the to believe that the challenged conduct was so outrageous, that no competent attorney would have engaged in it. SEE: Goodspeed VS. STATE, 187. S.W. 3d. 390, 392, [TEX Crim, App. 2005].

# "Due Process of Law"

"Due course," as used in the state constitutional provision that no citizen of this state shall be deprived of life, liberty, property... except by the due course of the law of the land, is virtually the same as "due process," as used in the federal Constitution. U.S.C.A. Const. Amend. 14; Vernon's Ann. Texas Const. Art. 1, § 19. Tarrant Appraisal Dist. V. Gateway Center Associates, Ltd, 34 S.W. 3d 712.

The actions of officer Molander violated the constitutional and statutory rights of the Petition, under the 4th, 5th, 6th, and 14th Amendments to the United States Constitution, Article 1, section 9 of the Texas Constitution, and under Article 38.23 of the Texas Code of Criminal Procedure. Also The actions of the Prosecutor's violated the petitioners Rights in "Due process law". by failing to investigate Petitioners evidence which would've proven his innocents. which was in the possession of his Attorney [Tim James]., as well as Investigator Gary Parten as reported to Attorney Tim James.